1
2
3
4
5
6
7
8
9          **IN THE UNITED STATES DISTRICT COURT**

10         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12   VERONICA GAMEZ,                          CASE NO. CV-F-05-1512 LJO

13                  Plaintiff,                **DECISION ON SOCIAL SECURITY**
                                              **COMPLAINT**
14        vs.                                 (Docs. 14-16.)

15   JO ANNE B. BARNHART,
     Commissioner of Social
16   Security,

17                  Defendant.
                                         /
18

19                        __INTRODUCTION__

20         Plaintiff Veronica Gamez ("plaintiff") seeks this Court's review of an administrative law judge's

21   ("ALJ's") decision that plaintiff is neither disabled nor entitled to Supplemental Security Income ("SSI")

22   under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1382c.  Pursuant to 28 U.S.C. § 636(c)

23   and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by an April

24   3, 2006 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all

25   proceedings.  Based on review of the Administrative Record ("AR") and the papers of plaintiff and

26   defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES

27   plaintiff's request to reverse the Commissioner's decision to deny plaintiff SSI  or to remand for further

28   proceedings.

                                              1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BACKGROUND**

**Plaintiff's Personal Background**

Plaintiff is age 36, has a seventh grade education, and lacks past relevant work.  (AR 76, 90, 97, 116, 123, 439, 595.)

**Administrative Proceedings**

**Plaintiff's Original SSI Application**

On July 22, 1999, plaintiff protectively filed her original SSI application to claim disability since July 1, 1999 due to internal injuries, muscle spasms and inability to lift more than five pounds, stand, sit or walk.  (AR 53, 75, 76, 84, 93.)  With its December 30, 1999 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined that her condition is not severe enough to prevent her to work.  (AR 53.)  On February 22, 2000, plaintiff filed her Request for Reconsideration to claim disability due to "injuries sustained in [a] car accident."  (AR 57.)  With its May 30, 2000 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work.  (AR 58.)  Plaintiff sought no further review of her claim denial.

**Plaintiff's Operative SSI Applications**

On October 17, 2001, plaintiff protectively filed another SSI application to claim disability since March 1995 due to inability to lift more than 10 pounds, constant back, leg, arm and hand pain, inability to sit for periods of time from back pain, inability to walk from foot swelling, and constant mood swings. (AR 79, 80, 116.)  With its April 9, 2002 Notice of Disapproved Claims, SSA denied plaintiff's claim and determined that her condition is not severe enough to prevent her to work.  (AR 62.)  On June 12, 2002, plaintiff filed her Request for Reconsideration to claim that she is disabled.  (AR 66.)  With its September 13, 2002 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work.  (AR 67.)

On November 8, 2002, plaintiff filed her Request for Hearing by Administrative Law Judge to claim disability and inability to perform house work and to lift and bend.  (AR 71.)  On January 23, 2003, counsel was appointed for plaintiff.  (AR 25.)  After a July 22, 2003 hearing, the ALJ issued a September 19, 2003 decision to determine that plaintiff had residual functional capacity to perform a

2

wide range of medium work and is ineligible for SSI based on her October 17, 2001 SSI application. (AR 20.)  On November 14, 2003, plaintiff filed a Request for Review of Hearing Decision/Order to claim inability to "perform substantial gainful work."  (AR 10.)  On January 14, 2004, SSA's Appeals Council denied plaintiff's request to render her claim subject to this Court's review.  (AR 6.)

Before this Court, plaintiff and the Commissioner stipulated to remand plaintiff's case to an ALJ to evaluate plaintiff's obesity and to take vocational expert testimony.  (AR 458.)  With its October 18, 2004 order, the Appeals Council remanded to the ALJ to evaluate plaintiff's obesity, to further consider plaintiff's maximum residual functional capacity, and to obtain vocational expert evidence to clarify the effect of assessed limitations on plaintiff's occupational base.  (AR 464-465.)  After a February 16, 2005 hearing, the ALJ issued her March 10, 2005 decision to conclude that plaintiff is able to perform light work with a sit/stand option, is not disabled and is ineligible for SSI.  (AR 444-445.)[1]  After plaintiff submitted April 7, 2005 exceptions to the March 10, 2005 ALJ decision (AR 431-434), the Appeals Council, on September 29, 2005, declined jurisdiction to render the ALJ decision subject to this Court's review.  (AR 428.)

**Medical History And Records Review**

*Valley State Prison For Women*

During her incarceration, plaintiff received medical treatment at Valley State Prison for Women. On December 16, 1998, plaintiff complained of chest pain and pain radiation to her left arm.  (AR 167.) A staff physician assessed common migraine headache by history and costochondritis, i.e., Tietze's syndrome, by examination and history.  (AR 167.)  On December 17, 1998, plaintiff complained of muscle spasms in her abdomen and back.  (AR 166.)  On January 29, 1999, plaintiff complained of chest pain.  (AR 163.)  On April 1, 1999, plaintiff complained of abdomen pain severe enough to prevent her to walk.  (AR 159.)

*Tulare Community Health Clinic And Jatinder Chopra, M.D., Treating Physician*

Plaintiff treated at Tulare Community Health Clinic where her primary physician was Jatinder

---

[1]    Plaintiff had filed a November 5, 2003 SSI application, the evidence for which was consolidated with plaintiff's October 17, 2001 SSI application to result in the March 10, 2005 ALJ decision to cover "the entire period though the date of this decision."  (AR 438.)

Chopra, M.D. ("Dr. Chopra").  On November 1, 1999, plaintiff complained of back, chest and abdomen pain and headaches.  (AR 338.)  On November 30, 1999, plaintiff complained of cough and chest pain and was assessed with bronchitis.  (AR 334.)  On January 11, 2000, plaintiff was assessed with bronchitis and Reactive Airway Disease.  (AR 333.)  On January 18, 2000, plaintiff treated for back pain.  (AR 332.)  On February 15, 2000, plaintiff complained of back and stomach pain.  (AR 329.)  On February 28, 2000, plaintiff was assessed with diabetes mellitus and provided diet education.  (AR 326.)  On March 13, 2000, plaintiff was treated for her cough and assessed with bronchitis.  (AR 324.)

In February 2001, plaintiff was assessed with hypertension.  (AR 308, 309.)  In spring, summer and fall 2001, plaintiff treated for sore throat and cough and was assessed with bronchitis, diabetes mellitus and hypertension.  (AR 282, 285, 288-290, 293, 297-301, 304, 306, 307.)  On October 2, 2001, plaintiff complained of chest and stomach pain and headache.  (AR 284.)  On November 15, 2001, plaintiff was assessed with back pain.  (AR 280.)

During 2002 visits , plaintiff continued to treat for her cough and was assessed with at different visits and generally treated with medication for bronchitis, diabetes mellitus, hypertension and back pain for which she was generally treated with medication.  (AR 263, 264, 265, 268-274, 378-381, 391.)  On February 28, 2002, plaintiff complained of chest and right knee pain.  (AR 271.)  On March 14, 2002, plaintiff was assessed with depression.  (AR 270.)  In spring 2002, plaintiff treated for chest cold.  (AR 265, 267.)  On July 3, 2002, plaintiff was assessed with abdomen pain.  (AR 263.)

During 2003 at different visits, plaintiff was assessed with and treated generally with medication for a pulled lower abdomen muscle, back pain, hypertension, cough, sore throat, asthma, bronchitis and diabetes mellitus.  (AR 362, 363, 370, 374-376, 550-552, 556, 557, 560, 563, 564, 566, 567, 569, 570, 579-582, 584.)

Dr. Chopra completed a January 29, 2003 Written Questionnaire to note that plaintiff's back pain and diabetes mellitus prevent her to engage in competitive employment on a regular sustained, productive basis.  (AR 346.)  Dr. Chopra characterized plaintiff's disability as permanent.  (AR 346.)

Dr. Chopra completed a January 29, 2003 Medical Source Statement Form Assessment of Functional Capacity to assess that plaintiff's back pain limits her to lift less than 10 pounds and to sit less than six hours during an eight-hour workday.  (AR 347.)  Dr. Chopra noted that plaintiff's back pain

4

1   prevents her to bend, squat, crawl, climb, crouch and kneel and limits her to occasional above reaching

2   and stooping.  (AR 348.)  Dr. Chopra noted muscle spasm as an objective sign of plaintiff's pain and

3   characterized plaintiff's pain as moderate.  (AR 349, 350.)  Dr. Chopra noted that plaintiff's pain would

4   often interfere with her attention and concentration.  (AR 350.)

5       On October 6, 2003, plaintiff complained of pain in the area of her April 2003 hernia surgery.

6   (AR 565.)

7       During 2000-2003, Dr. Chopra filled out Tulare County Health and Human Service Agency

8   forms to indicate that plaintiff is unable to work or to participate in a training/education program due

9   to back pain, diabetes mellitus, hypercholesterol, asthma, headache, hypertension and bronchitis.  (AR

10  351-361.)

11      During 2004 at different visits, plaintiff was assessed with and treated generally with medication

12  for hypertension, acute bronchitis and tonsillitis, abdominal, chest and back pain, generalized anxiety

13  disorder, insomnia, peptic ulcer disease and diabetes mellitus.  (AR 510, 511, 514-533, 535-549.)  On

14  January 29, 2004, Dr. Chopra noted plaintiff's abdominal hernia.  (AR 547.)

15      Dr. Chopra completed a January 31, 2005 Residual Functional Capacity Questionnaire to note

16  his diagnoses of back and abdominal pain, medication treatment and guarded prognosis.  (AR 587, 588.)

17  Dr. Chopra noted plaintiff's symptoms of constant abdomen pain due to surgeries, hernia, accident and

18  overweight, constant back pain and arthritis in hands, arms and legs, and "constant pain over all body

19  (severe)."  (AR 587.)  Dr. Chopra commented that "because of hernias recurring, she is permanently

20  disabled."  (AR 588.)  Dr. Chopra checked a box that plaintiff's impairments have lasted or are expected

21  to last 12 months.  (AR 588.)  Dr. Chopra checked boxes that depression and anxiety are psychological

22  conditions that affect her physical condition.  (AR 588.)  Dr. Chopra checked a box that plaintiff's pain

23  would constantly interfere with her attention and concentration to perform simple work tasks and

24  estimated that plaintiff is able to maintain attention and concentration for 20 minutes at a time.  (AR

25  588.)  Dr. Chopra checked a box that plaintiff is incapable of "low stress" jobs but failed to complete

26  the section to explain his conclusions.  (AR 589.)  Dr. Chopra estimated that plaintiff is able to: (1) walk

27  one block without rest or severe pain; (2) sit 20 minutes at one time; (3) walk 20 minutes at one time;

28  and (4) sit or stand/walk less than two hours during an eight-hour work day.  (AR 589.)  Dr. Chopra

checked boxes that plaintiff would need to walk every 20 minutes for 10 minutes during an eight-hour

workday. (AR 589.) Dr. Chopra noted that plaintiff would need during an eight-hour workday to take

30-minute breaks every 20 minutes. (AR 590.) Dr. Chopra restricted plaintiff from lifting, twisting,

crouching, and climbing. (AR 590.) Dr. Chopra estimated that plaintiff would be absent more than four

days per month due to impairments or treatment. (AR 591.)

### Duc Pham, Consultative Internist

Board certified internist Duc Pham, M.D. ("Dr. Pham"), conducted an October 23, 1999

comprehensive internal medical examination. (AR 188.) Plaintiff's complained of internal injuries, low

back pain, and constant, daily lower abdominal pain. (AR 188.) Plaintiff explained to Dr. Pham that

plaintiff suffered internal abdomen injuries when she was intoxicated and collided her vehicle into a

semi-truck trailer. (AR 188.) Dr. Pham recorded plaintiff 5-foot-3 height and weight of 240 pounds.

(AR 189.) Dr. Pham's abdomen examination elicited no pain response with moderate to deep

stethoscope palpation. (AR 189.) Dr. Pham's back examination revealed no palpable spasm. (AR 189.)

Dr. Pham observed that plaintiff was able to walk on heels and toes, stand on one foot and do a deep

knee bend. (AR 190.) Dr. Pham diagnosed history of prior abdominal surgery with continued

abdominal pain per plaintiff and lower back pain. (AR 190.) As to plaintiff's low back, Dr. Pham found

good range of motion and no spasm. (AR 191.) Dr. Pham questioned plaintiff's complaints:

> She does have inconsistent pain response to palpation in abdominal exam. Her abdomen was soft and there was no guarding. She did have subjective pain out of proportion to the exam level. She had negative straight leg raise tests. She did not have pain when I tested her source muscles when I flexed her hips. It seems unlikely that there is any inflammatory cause for her abdominal pain. . . . Her exam did seem a bit out of proportion with distractability on stethoscope evaluation.
>
> . . . Otherwise, there were no obvious range of motion limitations. To be conservative, she probably shouldn't lift anything more than 45 pounds at a time and should avoid bending and stooping if possible. (AR 191.)

### Tulare District Hospital

Plaintiff treated a Tulare District Hospital and on March 9, 2001, complained of cough and chest

pain. (AR 231, 233.) On March 12, 2001, plaintiff sought treatment for breathing difficulty. (AR 228.)

On April 18, 2001, plaintiff sought treatment for left ear ache and sore throat. (AR 218.) On October

4, 2001, plaintiff sought treatment for abdominal and chest pain and vomiting. (AR 213.) On each

1   occasion, plaintiff was neither admitted nor received significant treatment.  (AR 213-234.)

2       On April 21, 2003, plaintiff underwent an incisional herniorrhaphy with mesh application, which

3   she tolerated well.  (AR 394.)  Plaintiff was discharged on April 23, 2003 with recommendations of no

4   heavy lifting and limited activity for six weeks.  (AR 392.)

5       On August 29, 2003, plaintiff sought treatment for pubic abdominal pain.  (AR 489, 494.)  June

6   2004 examinations revealed tenderness along plaintiff's lower abdominal area with a bulging mass.  (AR

7   503, 571.)  Plaintiff was scheduled for an incisional hernia repair.  (AR 503.)  Plaintiff underwent an

8   August 5, 2004 incisional hernia repair with mesh without complications.  (AR 484, 502.)  Plaintiff

9   recovered from the hernia repair without complication.  (AR 501.)

10                  ***Charles House, Ph.D., Consultative Psychologist***

11       Psychologist Charles House, Ph.D. ("Dr. House"), conducted a March 1, 2002 comprehensive

12   psychiatric evaluation.  (AR 235.)  Plaintiff's chief complaints were that she is "unable to work because

13   of a medical condition," is "always sick," and "used drugs for a long period of time" to make her sick.

14   (AR 236.)  Plaintiff's further complaints included depression episodes with associated crying, fatigue,

15   sleep difficulty, and panic disorder.  (AR 236.)  Dr. House noted that although plaintiff claimed "mood

16   swings and cycles rapidly," "observation and history do not substantiate the presence of such."  (AR

17   236.)  Dr. House further noted that although plaintiff claimed "chronic pain," "she exhibited no evidence

18   of pain."  (AR 236.)  Plaintiff acknowledged the absence of mental health treatment.  (AR 236.)

19   Although plaintiff acknowledged a history of problems with alcohol, marijuana and crank cocaine, she

20   denied current use of alcohol or street drugs.  (AR 237.)  Plaintiff noted that she had been incarcerated

21   in 1997 due to substance abuse and in 1998 and 1999 due to firearm possession.  (AR 237.)  Plaintiff

22   noted that her daily living and recreation activities include bathing, bed making, telephoning, cooking,

23   television watching, dish washing, child care, napping, and staying in bed.  (AR 237-238.)

24       Dr. House's examination revealed plaintiff's cooperative, pleasant attitude, unremarkable

25   behavior, normal productive speech, focused but mildly depressed and anxious thought content, full

26   range mood, mood congruent effect, intact cognitive functioning with no impairment in concentration,

27   memory or attention, good insight, good concentration, persistence and pace, good attention, average

28   intellectual level without cognitive impairment or thought disorder, and intact memory.  (AR 238-240.)

1  Dr. House diagnosed mood disorder, not otherwise specified, from history, polysubstance abuse

2  disorder, from history, allegedly in remission as per claimant, and personality disorder, mixed type, with

3  antisocial features. (AR 240.) Dr. House opined that plaintiff will have no difficulty to perform simple,

4  repetitive tasks because of adequate intelligence, intact cognitive skills, ability to handle two- and three-

5  step problem resolution, and intact attention span and memory. (AR 241.) Dr. House further opined

6  that plaintiff will have no difficulty to: (1) perform more complex tasks; (2) accept supervision; (3)

7  interact appropriately with coworkers and general public; and (4) maintain work attendance. (AR 241.)

8  ### Sherry Lopez, D.O., Consultative Internist

9  Internist Sherry Lopez, D.O. ("Dr. Lopez"), conducted a March 6, 2002 comprehensive internal

10  medicine evaluation. (AR 245.) Plaintiff's chief complaints were hypertension, asthma, diabetes

11  mellitus and right knee and abdominal pain. (AR 245.) Plaintiff acknowledged that she had never been

12  hospitalized for her hypertension, asthma or diabetes mellitus and that she did not need an assistive

13  device for her right knee pain. (AR 246.) Plaintiff further acknowledged that she had smoked

14  methamphetamine, cocaine and marijuana and had abused alcohol. (AR 246.) Dr. Lopez noted

15  plaintiff's 5-foot-3 height and weight of 258 pounds. (AR 247.) Dr. Lopez' examination revealed no

16  abdomen tenderness to palpation, normal spine and hip range of motion, and 5/5 motor strength in lower

17  and upper extremity muscle groups. (AR 247-248.) Dr. Lopez diagnosed hypertension, currently well

18  controlled, asthma – no current evidence of exacerbation, diabetes mellitus, history of right knee pain,

19  and abdominal pain – secondary to surgery performed in 1994. (AR 248.) Dr. Lopez noted "no

20  neurologic deficits with regards to her back pain." (AR 248.) As to plaintiff's asthma, Dr. Lopez noted

21  that plaintiff does not use accessory muscles and has not been placed on steroids to suggest "her asthma

22  is pretty well controlled." (AR 248.) Dr. Lopez noted no problem with plaintiff's past shingles problem.

23  (AR 248.) Dr. Lopez concluded that plaintiff is able to: (1) stand or walk six hours in a workday; (2)

24  sit without restriction during a workday; and (3) lift 20 pounds frequently and 50 pounds occasionally.

25  (AR 248.) Dr. Lopez assessed "no postural limitations" and noted plaintiff "uses no assistive devices."

26  (AR 248.)

27  ### Non-Examining Physicians

28  California Disability Determination Services ("DDS") physician Atoine Dipsia, M.D. ("Dr.

Dipsia"), completed a December 27, 1999 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand and/or walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift/carry restrictions. (AR 193.) Dr. Dipsia noted no postural limitations and concluded that based on minimal findings and plaintiff's low credibility, plaintiff is capable of medium work. (AR 194, 198.)

Board certified internist and DDS physician Michael F. Escobar, M.D. ("Dr. Escobar"), completed a May 26, 2000 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand and/or walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift/carry restrictions. (AR 203.) Dr. Escobar found no postural limitations other than to preclude plaintiff from climbing ramps and stairs. (AR 204.)

DDS physician Murray Mitts, M.D. ("Dr. Mitts"), completed an April 4, 2002 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift/carry limitations. (AR 251.) Dr. Mitts assessed no postural limitations. (AR 252.) On September 6, 2002, DDS physician Alfred Torre, M.D. ("Dr. Torre"), affirmed Dr. Mitts' assessment. (AR 256.)

DDS physician Glenn Ikawa, M.D. ("Dr. Ikawa"), and Dr. Mitts completed an April 4, 2002 Psychiatric Review Technique to assess plaintiff with mood disorder, not otherwise specified, from history, personality disorder, mixed type with antisocial features, and polysubstance dependence from history and allegedly in remission. (AR 340-342.) Plaintiff's condition was characterized as non-severe. (AR 343.)

### *Medical Imaging*

An April 15, 1999 barium enema x-ray was normal and revealed status post right upper quadrant surgery. (AR 156.) A February 15, 2000 medical imaging report to address plaintiff's back and abdominal pain noted hypolordotic curvature but otherwise normal lumbar spine and status post cholecystectomy but otherwise normal abdomen. (AR 328.) February 1, 2002 right knee x-rays were

negative and revealed neither fracture, bony abnormality nor arthritic changes.  (AR 261.)  February 7, 2003 pelvis and abdomen CT scans revealed a midline abdominal wall defect with hernia, a small left ovarian cyst, and status post cholecystectomy.  (AR 371, 372.)  An August 29, 2003 medical imaging report noted plaintiff's normal heart size and pulmonary vascularity.  (AR 568, 500.)  An October 29, 2003 pelvic ultrasound revealed small follicles of each ovary and slightly inhomogenous uterus without evidence of discrete mass.  (AR 485, 558.)  August 2, 2004 chest x-rays were normal and revealed repair of symptomatic incisional hernia.  (AR 505.)

### *Medications*

Plaintiff's medications have included Ibuprofen 600 mg, Tagament, Sudafed, Elavil 50 mg, Tylenol with Codeine No. 3, Naproxen 500 mg, Glipizide 5 mg, Ambien 10 mg, Amoxicillin 500 mg, Allegra 60 mg, Paxil 20 mg, Lotrel, Prilosec 20 mg, Dyazide, Flurazepam 30 mg, Aciphex 20 mg, Ultram 50 mg, Combivent, Trimox, Tramdol 50 mg, Carisoprodol 350 mg, Uniphyl, Omeprazole, Amitriptyline, Hydrocodone 750 mg, Endocet, Promethazine and Albuterol inhaler.  (AR 89, 139, 150, 152, 153, 475, 476.)

### **Plaintiff's Activities And Testimony**

### *Reports And Questionnaires*

Plaintiff completed an August 13, 1999 Disability Report Adult to note her 5-foot-3 height and weight of 180 pounds.  (AR 83.)  Plaintiff claimed inability to work since March 11, 1996 due to an automobile accident, internal injuries and two major stomach operations.  (AR 84.)  Plaintiff had not obtained treatment for emotional or mental problems that limit her ability to work.  (AR 85.)

Plaintiff completed an August 24, 1999 Daily Activities Questionnaire to note that on an average day that she prepares her son for school, walks her son 2½ blocks to school, returns home, and walks to pick up and return her son in the afternoon.  (AR 100, 102.)  Plaintiff's teenage daughter assists plaintiff with household chores and cooking.  (AR 101.)  Plaintiff grocery shops, and her mother helps to bag, load and unload the groceries.  (AR 101.)  Plaintiff watches television "about most of the day." (AR 102.)  Plaintiff has no difficulties to get along with others.  (AR 103.)  Plaintiff attends church weekly.  (AR 103.)  Plaintiff experiences difficulty to stand, walk and sit and is unable to lift more than five pounds.  (AR 104.)  Migraines interfere with plaintiff's concentration.  (AR 104.)

1     Plaintiff completed a February 21, 2000 Reconsideration Disability Report to claim again

2     difficulty to stand and sit and that her right knee is fractured.  (AR 106.)

3     Plaintiff completed a March 28, 2000 Asthma Questionnaire to claim asthma attacks once or

4     twice daily and her four times daily use of Albuterol.  (AR 110.)

5     Plaintiff completed a November 1, 2001 Disability Report Adult to note her 5-foot-2 height and

6     weight of 260 pounds.  (AR 115.)  Plaintiff claimed inability to work since March 12, 1995 due to

7     inability to lift 10 pounds, to sit for periods of time and to walk much, constant back, leg, arm and hand

8     pain, and mood swings.  (AR 116.)  Plaintiff further noted health changes, including diabetes, asthma,

9     allergies, constant pain, ulcers, high blood pressure, and metal clamps left in the right side of her

10    stomach.  (AR 124.)

11    Plaintiff completed a November 19, 2001 Asthma Questionnaire to note her four times daily use

12    of an Albuterol inhaler and loss of breath.  (AR 126.)  Plaintiff has not been hospitalized due to asthma.

13    (AR 126.)

14    Plaintiff's sister completed a November 22, 2001 Daily Activities Questionnaire (Third Party

15    Information) to note that plaintiff lives with her son and boyfriend.  (AR 127.)  On a typical day, plaintiff

16    cleans slowly because she tires easily.  (AR 127.)  Plaintiff prepares easy meals, including a daily dinner.

17    (AR 128.)  Plaintiff shops once a month with assistance of her boyfriend or son to carry groceries.  (AR

18    128.)  Plaintiff takes care of bills and performs household chores, including cleaning and laundry.  (AR

19    129.)  Plaintiff has a drivers license and drives.  (AR 129.)  Plaintiff watches up to four hours of

20    television daily.  (AR 130.)  Plaintiff has no difficulty to get along with others.  (AR 130.)

21    Plaintiff completed a November 24, 2001 Daily Activities Questionnaire to note that on an

22    average day, plaintiff watches television, cleans and cooks.  (AR 133.)  Plaintiff experiences sleep

23    difficulties from nightmares and "constant pain in all parts of body."  (AR 133.)  Plaintiff grocery shops

24    but needs help to bag and carry the groceries.  (AR 134.)  Plaintiff watches television about four hours

25    a day.  (AR 135.)  Plaintiff reads newspapers "to keep up with the news."  (AR 135.)  Lack of strength,

26    shortness of breath and constant pain prevent plaintiff to work.  (AR 137.)

27    Plaintiff completed a June 12, 2002 Reconsideration Disability Report to claim worsened back

28    pain, numbness in legs and arms, inability to bend at waist, limited ability to sit, bad cough, and daytime

1  tiredness due to night sleep difficulty.  (AR 140,142.)

2       In an undated statement, plaintiff complained of increased back pain, leg swelling, hand pain and

3  swelling, cramps with muscle spasms, inability to sweep, mop or scrub due to back pain to prevent

4  bending, constant depression, mood swings, anxiety attacks and sleep difficulty.  (AR 147, 149.)  In

5  another undated statement, plaintiff claimed total disability due to recurring hernias, inability to lift more

6  than five pounds, bad hand and leg circulation and swelling, and inability to stand or sit more than 20

7  minutes.  (AR 474.)

8                    ***Plaintiff's July 22, 2003 ALJ Hearing Testimony***

9       Plaintiff testified at the July 22, 2003 ALJ hearing that she lives with her pre-teen son and

10  boyfriend. (AR 407.)  Plaintiff dropped out of school in seventh grade and did not return to school.  (AR

11  407.)  Plaintiff is 5-foot-3 and weighs 247 pounds.  (AR 407.)  Plaintiff has a driver's license and drives

12  twice  weekly.  (AR 408.)

13       Plaintiff performed no work in the past 15 years.  (AR 408.)  Constant abdominal and back pain

14  prevent plaintiff to work.  (AR 408.)  Plaintiff's abdominal pain started after a 1997 automobile accident.

15  (AR 409.)  Plaintiff has had "two major surgeries."  (AR 409.)  Metal clamps were inserted during a

16  surgery.  (AR 410.)  Plaintiff's abdominal pain continues to worsen.  (AR 409.)

17       Plaintiff underwent an April 2003 hernia repair because "it was getting worse."  (AR 409, 410.)

18  Since the hernia surgery, plaintiff experienced constant left side pain.  (AR 410.)  Plaintiff believes she

19  has another hernia.  (AR 411.)  Plaintiff wears a brace to help protect the surgery's incision.  (AR 411,

20  417.)

21       Plaintiff has experienced back pain since a 1995 automobile accident.  (AR 411.)  The pain is

22  in the middle of her back and below the belt line.  (AR 411.)  The pain is "constant little nagging."  (AR

23  412.)  The pain spreads to plaintiff's waist and worsens with sitting.  (AR 412.)  Plaintiff's abdomen and

24  back pain limits her sitting to 30-45 minutes.  (AR 412.)

25       Plaintiff has diabetes for which she takes pills.  (AR 412-413.)  The diabetes causes poor blood

26  circulation and hand and leg swelling and numbness.  (AR 413, 419.)   Feet swelling limit plaintiff to

27  stand 20-30 minutes.  (AR 413.)  Plaintiff is able to walk "a block or less" due to asthma and muscle

28  spasms in her legs and hands.  (AR 413, 414.)

1  Plaintiff's hernia limits her to light lifting.  (AR 414.)  Plaintiff is able to lift a gallon of milk but

2  unable to hold it steady because her hands shake.  (AR 414.)

3  Plaintiff has been free of street drugs and alcohol for five to six years.  (AR 414-415.)  Plaintiff

4  daily takes 14 medications.  (AR 415.)  Plaintiff experiences no side effects "other than what I'm feeling

5  all the time."  (AR 415.)  Plaintiff takes Ambien to assist her sleep.  (AR 416.)  Plaintiff takes

6  medication for ulcers which flare up once or twice daily to cause stomach and throat burning to require

7  plaintiff to stop and wait five to 10 minutes.  (AR 417-418.)  Plaintiff has experienced ulcers since her

8  1995 automobile accident.  (AR 418.)  Medication controls plaintiff's hypertension and helps her

9  depression.  (AR 418-419.)

10  On a normal day, plaintiff awakes at 8 a.m., takes her pills, brushes her teeth and hair, prepares

11  her son's breakfast and tries "to do as much as I can around the house," including dish washing and

12  laundry.  (AR 419-420.)  Plaintiff prepares meals which she described as "easy . . . nothing major." (AR

13  421, 423.)  After breakfast and performing household chores, plaintiff watches television and talks to

14  her grandmother.  (AR 422.)  Plaintiff watches evening television.  (AR 423.)  Plaintiff drives to visit

15  her grandmother weekly.  (AR 422.)  Plaintiff grocery shops with her son who "puts in the heavy stuff."

16  (AR 422-423.)  Plaintiff is unable to scrub restrooms.  (AR 420.)

17  Prior to her hernia surgery, plaintiff experienced difficulty bending.  (AR 420.)  Pushing a

18  vacuum is difficult for plaintiff.  (AR 421.)

19  Plaintiff was first incarcerated for possession of narcotics for sale.  (AR 424.)  Plaintiff was

20  imprisoned later for 1½ years for firearm possession and probation violation.  (AR 424.)  Plaintiff

21  completed probation.  (AR 425.)  Plaintiff provided monthly urine drug tests, and all were clean.  (AR

22  425.)

23  ***Plaintiff's February 16, 2005 ALJ Hearing Testimony***

24  Plaintiff testified at the February 16, 2005 ALJ hearing that she has a seventh grade education

25  without a GED and performed no work during the past 15 years.  (AR 595.)  Plaintiff is 5-foot-2 and

26  weighs 245 or 255 pounds.  (AR 597.)  Plaintiff's weight fluctuates five to 10 pounds.  (AR 597.)

27  During a 1997 automobile accident, plaintiff suffered internal injuries to require "two major

28  operations."  (AR 595-596.)  Plaintiff underwent hernia repair surgeries in April 2003 and August 2004.

13

(AR 596.)  Plaintiff has two other hernias but needs to lose weight prior to surgery.  (AR 597, 600.)  Plaintiff's weight causes her hernias.  (AR 597.)  Plaintiff has no planned surgeries.  (AR 605-606.)

Since 1999, plaintiff has treated with Dr. Chopra who prescribes medication and refills them.  (AR 598.)  Dr. Chopra has prescribed plaintiff 15 medications which she takes.  (AR 598.)  Plaintiff takes Vicodin for pain, Soma to relax her stomach area and legs, Paxil and Elavil for depression and cramps, and Glipizide for diabetes.  (AR 599.)  Medication helps plaintiff's depression. (AR 607.)  Plaintiff attributes no specific side effects to her medication.  (AR 605.)

Plaintiff is unable to work because she is unable to sit "for very long" and experiences leg cramping and swelling, hand swelling, and constant stomach and back pain.  (AR 600.)  Plaintiff is unable to lift or carry more than five pounds because of her hernias.  (AR 600-601.)  Plaintiff is able to sit 20 minutes and longer with her feet elevated.  (AR 601.)  Plaintiff is able to stand 20 minutes.  (AR 601.)  Plaintiff elevates her feet two or three times a day for 20-30 minutes to stop "the tingling and the cramping." (AR 601.)  Plaintiff lies down two or three times a day for 20-30 minutes because "I feel tired most of the time." (AR 602.)  Plaintiff estimates that she is able to sit or stand one or two hours during an eight-hour day with breaks.  (AR 602-603.)

Plaintiff's diabetes causes her to tire.  (AR 599.)  Plaintiff does not know the condition of her ulcers because she had not checked it recently.  (AR 607.)  Plaintiff experiences constant dull hand pain and has been unable to knit for several years.  (AR 608.)

Pain causes plaintiff to become agitated to interfere with her focus.  (AR 609.)  Once or twice a day, plaintiff's pain is severe enough to interfere with her concentration and attention for 30-60 minutes.  (AR 609-610.)  On bad days, plaintiff lacks the energy to get out of bed.  (AR 610.)  Plaintiff experiences bad days once or twice a week and at times, puts off doctors' appointments because she cannot make them.  (AR 610.)

Plaintiff lives with her preteen son and boyfriend.  (AR 603.)  Plaintiff cooks and is able to do laundry.  (AR 603-604.)  Plaintiff neither mops, sweeps nor vacuums due to stomach and back pain.  (AR 604.)  Plaintiff has a driver's license and drives three or four times a week.  (AR 604.)  Plaintiff grocery shops, and her son or boyfriend carries, loads and unloads the groceries.  (AR 605.)

Plaintiff wears a stomach brace and attributes Dr. Chopra as telling her to wear it.  (AR 606.)

14

1   Plaintiff requires assistance to put on socks, tie shoes and scrub her feet.  (AR 606, 607.)

2       Plaintiff has used neither street drugs nor alcohol since she was incarcerated in 1998.  (AR 600,

3   611.)  Plaintiff has been clean and sober since she was released from incarceration.  (AR 600.)  In 1997,

4   plaintiff was incarcerated for possession of a cocaine for sale.  (AR 611.)  Plaintiff was later incarcerated

5   for firearm possession and probation violation.  (AR 611.)  Plaintiff completed her parole but is on

6   probation for welfare fraud.  (AR 612.)

7   ***Vocational Expert Thomas C. Dachelet's Testimony At February 16, 2005 ALJ Hearing***

8       Vocational expert Thomas C. Dachelet ("Mr. Dachelet") testified at the February 16, 2005 ALJ

9   hearing that plaintiff lacks past relevant work.  (AR 613.)  As a first hypothetical, the ALJ asked Mr.

10  Dachelet to assume a person who: (1) is plaintiff's age; (2) has a seventh grade education; (3) has no

11  work experience; and (4) has residual functional capacity for light work with a sit/stand option.  (AR

12  613.)  Mr. Dachelet testified that such person is able to perform as a cafeteria assistant (377 jobs in

13  California and 3,770 nationally), cashier (3,158 jobs in California and 31,580 nationally) and

14  miscellaneous agricultural worker (3,677 in California and 36,770 nationally) but that such jobs would

15  be reduced by two-thirds with the sit/stand option.  (AR 443, 614-615.)

16      As a second hypothetical, the ALJ asked Mr. Dachelet to assume a person who has residual

17  functional capacity for sedentary work with a sit/stand option.  (AR 616.)  Mr. Dachelet testified there

18  are "basically" no jobs for such a person.  (AR 616.)

19      As a third hypothetical, the ALJ asked Mr. Dachelet to assume a person who is limited to

20  sedentary work and needs unscheduled breaks every 20 minutes.  (AR 617.)  Mr. Dachelet testified there

21  are no jobs for such person.  (AR 617.)

22      As a fourth hypothetical, the ALJ asked Mr. Dachelet to assume the same person as in the ALJ's

23  first hypothetical with ability to kneel to pick something off the floor.  (AR 621.)  Mr. Dachelet testified

24  that such person is able to perform the same jobs as the person in the first hypothetical.  (AR 621.)

25      As a first hypothetical, plaintiff's counsel asked Mr. Dachelet to add a bending preclusion to the

26  ALJ's first hypothetical.  (AR 617.)  Mr. Dachelet testified there are no jobs for such a person.  (AR 617-

27  618.)

28      As a second hypothetical, plaintiff's counsel asked Mr. Dachelet to assume a person who: (1)

is plaintiff's age; (2) has a seventh grade education; (3) has no relevant work experience; (4) has a light residual functional capacity; and (5) needs to elevate his/her feet two or three unscheduled times a day for 20-30 minutes a time. (AR 621-622.) Mr. Dachelet testified that there are no jobs for such person. (AR 622.)

As a third hypothetical, plaintiff's counsel added to his second hypothetical difficulty to concentrate and to focus for 30-60 minutes at a time. (AR 622.) Mr. Dachelet testified that there are no jobs for such person. (AR 622.)

As a fourth hypothetical, plaintiff's counsel asked Mr. Dachelet to assume a person who is able to: (1) sit less than two hours in an eight-hour workday; (2) stand and walk less than two hours in an eight-hour workday; and (3) lift five pounds. (AR 622.) Mr. Dachelet testified that there are no jobs for such person. (AR 622.)

### The ALJ's Findings

With her March 10, 2005 decision, the ALJ identified the primary issue as whether plaintiff is under a disability. (AR 438.) After concluding that plaintiff is capable to perform a significant number of jobs in the national economy, is not disabled and thus ineligible for SSI, the ALJ found:

1.  Plaintiff has morbid obesity, chronic low back pain and residuals from ventral hernia repair with mesh to each constitute a severe impairment but which do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

2.  Plaintiff's allegations regarding her limitations are not totally credible.

3.  Plaintiff has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently and to stand and/or walk six hours in an eight-hour workday with a sit/stand option.

4.  Plaintiff has no non-exertional limitations.

5.  Plaintiff has the residual functional capacity to perform a wide range of light work.

6.  Based on an exertional capacity for light work and plaintiff's age, education and work experience, section 202.17 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2, directs a finding of "not disabled." (AR 444.)

16

1 <u>**DISCUSSION**</u>

2 <u>**Standard Of Review**</u>

3      Congress has provided limited judicial review of a Commissioner's decision made through an

4 ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if

5 supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's

6 decision, made through an ALJ, when the determination is not based on legal error and is supported by

7 substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of*

8 *Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant

9 could perform light work contrary to treating physician's findings).[2]  Substantial evidence is "more than

10 a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a

11 preponderance,  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial

12 evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion."

13 *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

14      The record as a whole must be considered, weighing both the evidence that supports and detracts

15 from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

16 substantial evidence to support the administrative finding, or if there is conflicting evidence that will

17 support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

18 *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than

19 one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

20 *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

21 Cir. 1999).

22      This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

23 is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

24 whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

25 reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

26

27      [2]      "The district court properly affirms the Commissioner's decision denying benefits if it is supported by
substantial evidence and based on the application of correct legal standards."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th

28 Cir. 1997).

Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete and detailed objective medical reports of his condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). "Failure to prove disability justifies a denial of benefits." *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005); *see Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356 (1996).  Plaintiff must furnish medical and other evidence about plaintiff's medical impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine whether you are disabled or blind.  You are responsible for providing that evidence.")

_____In her opening brief, plaintiff cites as impairments obesity and related complications, including hernias and hernia repair surgery, back and abdominal pain, ulcers, diabetes, depression, asthma and hypertension.

With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's March 10, 2005 decision.

### Dr. Chopra's Assessment

_____Plaintiff contends that the ALJ improperly rejected treating physician Dr. Chopra's assessment to preclude plaintiff from sedentary work.  Plaintiff faults the ALJ's adoption of "the opinion of the non-treating, one-shot consultative examination by Dr. Lopez."  The Commissioner responds that the ALJ provided specific, legitimate reasons to reject Dr. Chopra's opinion and properly gave more weight to other medical evidence.

A treating physician's opinion is not conclusive as to a claimant's physical condition or the ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes*, 881 F.2d at 751.[3]  An ALJ may reject a treating physician's opinion whether

---

[3]    A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes,* 881 F.2d at 751. Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

The Ninth Circuit has further explained:

> To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." . . . The rule . . . does not apply, however, "when the nontreating physician relies on independent clinical findings that differ from the findings of the treating physician." . . . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence . . .'"

*Magallanes*, 881 F.2d at 751(citations omitted.)

An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See, e.g., Sandgathe*, 108 F.3d at 980. A physician's opinion of disability "premised to a large extent upon claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v. Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able to find a link between [claimant's] complaints and known medical pathologies").

"[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

As a reminder, Dr. Chopra completed a January 29, 2003 questionnaire to note that plaintiff's back pain and diabetes mellitus prevent her to engage in competitive employment on a regular sustained and productive basis. (AR 346.) Dr. Chopra assessed that plaintiff's back pain limited her to lift less than 10 pounds and to sit less than six hours during an eight-hour workday and prevented her to bend, squat, crawl, climb, crouch and kneel. (AR 348.) Dr. Chopra claimed the plaintiff's pain would often interfere with her attention and concentration. (AR 350.) Dr. Chopra also completed a January 31, 2005

19

1   questionnaire to conclude that recurring hernias permanently disabled plaintiff.  (AR 588.)  Dr. Chopra

2   noted that plaintiff's pain would constantly interfere with her attention and concentration to perform

3   simple work tasks and estimated that plaintiff is unable to maintain attention and concentration for 20

4   minutes at a time.  (AR 588.)  Dr. Chopra estimated that plaintiff is able to: (1) walk one block without

5   rest or severe pain; (2) sit 20 minutes at one time; (3) walk 20 minutes at one time; and (4) sit or

6   stand/walk less than two hours during an eight-hour work day.  (AR 589.)  Dr. Chopra claimed that

7   plaintiff would need to walk every 20 minutes for 10 minutes during an eight-hour workday.  (AR 589.)

8   Dr. Chopra noted that plaintiff would need during an eight-hour workday to take 30-minute breaks every

9   20 minutes.  (AR 590.)  Dr. Chopra restricted plaintiff from lifting, twisting, crouching and climbing.

10  (AR 590.)  Dr. Chopra estimated that plaintiff would be absent more than four days per month due to

11  impairments or treatment.  (AR 591.)

12      After detailing the medical evidence, including Dr. Chopra's assessments (439-442), the ALJ

13  discounted Dr. Chopra's January 31, 2005 questionnaire responses in that they appear "to be based solely

14  on the claimant's subjective complaints and . . . contradicted by the treatment record."  (AR 442.)  The

15  ALJ further explained:

16      Weight is given to the treating records from the Tulare Clinic in so far as they reflect the
        claimant's complaints, treatment, and limited objective findings; however, little weight
17      is given to the clinicians' [Dr. Chopra's] serial disability certifications, between January
        2000 and May 2002, for purposes of excusing the claimant from the Welfare
18      requirements of work or training.  These are obviously accommodations, and are not
        supported by the treating record.  The dates in the record corresponding to the
19      certifications do not, for the most part, show that the claimant complained of back pain
        or of symptoms attributable to diabetes; they most frequently show treatment of transient
20      illnesses, complaints of a cough (with the claimant advised to quit smoking), or simply
        "to have forms filled out" (Exhibit 9F, 13, 49-50, 66, 71).  Little weight is given to Dr.
21      Chopra's January 2003 statement that the claimant was precluded from competitive
        gainful employment by her impairments, or to his assessments of the claimant's physical
22      capacity discussed above.  Again, these statements appear to be based on uncritical
        acceptance of the claimant's complaints, are not supported by the treating records, and
23      are contradicted by the findings of the consultative examination.  (AR 442.)

24      The ALJ properly rejected Dr. Chopra's assessment in that it was unsupported by the medical

25  record, including Dr. Chopra's own treatment, was based on plaintiff's exaggerated complaints and

26  contradicted by other medical opinion.  The ALJ cannot be faulted for giving weight to records of Tulare

27  Community Health Clinic where plaintiff received routine treatment, including from Dr. Chopra, for

28  various complaints lacking significant objective findings.  A February 15, 2000 medical imaging report

1    to address plaintiff's back and abdominal pain were generally normal. (AR 328.) February 1, 2002 right

2    knee x-rays were negative. (AR 261.) Medical imaging of plaintiff's chest was normal. (AR 500, 505,

3    568.) Plaintiff's back pain complaints were sporadic. (AR 356, 375, 378.) The ALJ properly noted that

4    during September 2003 to December 2004, plaintiff sought routine treatment for diabetes, bronchitis,

5    "generalized anxiety," back pain, hypertension and tonsillitis and was treated merely with medication

6    refills with neither referrals to specialists, radiologic studies nor recommendations of more aggressive

7    treatment. (AR 440.) *See Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir.

8    1995) (ALJ entitled to draw inference from general lack of medical care).

9         The ALJ accorded proper weight to consultative internist Dr. Lopez' assessment. Dr. Lopez'

10   March 6, 2002 examination revealed no abdomen tenderness to palpation, normal spine and hip range

11   of motion, and 5/5 motor strength in lower and upper extremity muscle groups. (AR 247-248.) Dr.

12   Lopez diagnosed hypertension, currently well controlled, asthma – no current evidence of exacerbation,

13   diabetes mellitus, history of right knee pain, and abdominal pain – secondary to surgery performed in

14   1994. (AR 248.) Dr. Lopez noted "no neurologic deficits with regards to her back pain." (AR 248.)

15   As to plaintiff's asthma, Dr. Lopez noted that plaintiff does not use accessory muscles and has not been

16   placed on steroids to suggest "her asthma is pretty well controlled." (AR 248.) Dr. Lopez concluded

17   that plaintiff is able to: (1) stand or walk six hours in a workday; (2) sit without restriction during the

18   workday; and (3) lift 20 pounds frequently and 50 pounds occasionally. (AR 248.) Dr. Lopez assessed

19   "no postural limitations" and noted plaintiff "uses no assistive devices." (AR 248.) In weighing Dr.

20   Lopez' assessment, the ALJ accurately noted that Dr. Lopez' examination demonstrated plaintiff's

21   normal back range of motion and justified a restriction to light exertion based on plaintiff's hernia

22   repairs subsequent to Dr. Lopez' examination. (AR 442.)

23        The ALJ further accorded proper weight to consultative psychologist Dr. House's assessment.

24   Dr. House noted that although plaintiff claimed "mood swings and cycles rapidly," "observation and

25   history do not substantiate the presence of such." (AR 236.) Dr. House further noted that although

26   plaintiff claimed "chronic pain," "she exhibited no evidence of pain." (AR 236.) Dr. House's

27   examination revealed plaintiff's cooperative, pleasant attitude, unremarkable behavior, normal

28   productive speech, focused but mildly depressed and anxious thought content, full range mood, mood

congruent effect, intact cognitive functioning with no impairment in concentration, memory or attention, good insight, good concentration, persistence and pace, good attention, average intellectual level without cognitive impairment or thought disorder, and intact memory.  (AR 238-240.)  Dr. House diagnosed mood disorder, not otherwise specified, from history, polysubstance abuse disorder, from history, allegedly in remission as per plaintiff, and personality disorder, mixed type, with antisocial features.  (AR 240.)  Dr. House opined that plaintiff will have no difficulty to perform simple, repetitive tasks because of adequate intelligence, intact cognitive skills, ability to handle two- and three-step problem resolution, and intact attention span and memory.  (AR 241.)  Dr. House further opined that plaintiff will have no difficulty to: (1) perform more complex tasks; (2) accept supervision; (3) interact appropriately with coworkers and general public; and (4) maintain work attendance.  (AR 241.)  The ALJ appropriately observed that Dr. House's examination "demonstrated that the claimant had a mental capacity for simple to moderately complex work and might be exaggerating her pain symptoms."  (AR 442.)

Plaintiff further argues that "Dr. Chopra's limitations to inability to bend [are] supported by Dr. Pham's opinion that the claimant should avoid bending and stooping."  Plaintiff ignores that consultative internist Dr. Pham in 1999 questioned plaintiff's complaints and noted plaintiff's "inconsistent pain response" and "subjective pain out of proportion to the exam level."  (AR 191.)  Dr. Pham noted the absence of "obvious range of motion limitations" and conservatively limited lifting to 45 pounds and merely suggested avoidance of "bending and stooping if possible."  (AR 191.)  Plaintiff's comments as to Dr. Pham are unconvincing.

The ALJ accurately evaluated Dr. Chopra's overly restrictive limitations and explored their inconsistencies with the medical record.  In comparison with the other physician opinions accorded due weight, Dr. Chopra's assessment was brief and conclusory, lacked supportive clinical findings and depended on plaintiff's exaggerated claims.  The ALJ supported his findings with specific, legitimate reasons after detailing and summarizing the medical record.  The ALJ fulfilled his responsibility to resolve the differing assessments and to accord them appropriate weight.  Plaintiff points to no error in the ALJ's evaluation of Dr. Chopra's assessment or the medical evidence.

/ / /

**<u>Obesity</u>**

Plaintiff criticizes the ALJ for failing to discuss the impact of plaintiff's obesity on her ability to work.  The Commissioner responds that the ALJ properly considered plaintiff's obesity in the five-step sequential disability evaluation.

At step two of the disability evaluation, the ALJ found that plaintiff's morbid obesity, chronic low back pain and residuals from ventral hernia repair with mesh are "severe" and "significantly affect her abilities to perform basic work-related activities."  (AR 439.)  At step three of the disability evaluation, the ALJ reviewed plaintiff's daily activities and found them "consistent with at least light exertion." (AR 443.)  After noting plaintiff's weight, Dr. Lopez in her assessment (to which the ALJ accorded proper weight), concluded that plaintiff is able to: (1) stand or walk six hours in a workday; (2) sit without restriction during the workday; and (3) lift 20 pounds frequently and 50 pounds occasionally. (AR 248.)  Dr. Lopez assessed neither postural nor manipulative limitations.  (AR 248.)

SSR 02-01p addresses evaluation of obesity and explains:

> Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems.  It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems.  Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea.

SSA considers obesity to determine whether a claimant has a medically determinable impairment, the impairment(s) is severe, the impairment meets or equals the requirements of an impairment in the Listing of Impairments, and the impairment(s) prevents the claimant from doing past relevant work and other work that exists in significant numbers in the national economy.  SSR 02-01p.  SSA will find obesity is a "severe" impairment when, in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.  SSR 02-01p.

SSA evaluates obesity to assess residual functional capacity:

> Obesity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.  An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. . . .

1    . . .

2         An assessment should also be made of the effect obesity has upon the individual's
3    ability to perform routine movement and necessary physical activity within the work
     environment.  Individuals with obesity may have problems with the ability to sustain
4    function over time. . . . In cases involving obesity, fatigue may affect the individual's
     physical and mental ability to sustain work activity.  This may be particularly true in
5    cases involving sleep apnea.

6         The combined effects of obesity with other impairments may be greater than
     might be expected without obesity.  For example, someone with obesity and arthritis
7    affecting a weight-bearing joint may have more pain and limitation than might be
     expected from the arthritis alone.

8    SSR 02-01p.

9         An ALJ has responsibility to determine the effect of a claimant's obesity on the claimant's other

10   impairments, ability to work and general health, given the presence of the other impairments.  *See*

11   *Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003).

12        "As obesity is not a separately listed impairment, a claimant will be deemed to meet the

13   requirements if 'there is an impairment that, in combination with obesity, meets the requirements of a

14   listing.'"  *Burch*, 400 F.3d at 682 (quoting SSR 02-01p.)  "Equivalence may also be determined if a

15   claimant has multiple impairments, including obesity, none of which meets the listing requirement, but

16   which when viewed in the aggregate are equivalent to a listed impairment."  *Burch*, 400 F.3d at 682.

17   However, SSR 02-01p explains that an ALJ "will not make assumptions about the severity or functional

18   effects of obesity combined with other impairments.  Obesity in combination with another impairment

19   may or may not increase the severity or functional limitations of the other impairment. [The ALJ] will

20   evaluate each case based on the information in the case record."  An ALJ is "not required to discuss the

21   combined effects of a claimant's impairments or compare them to any listing in an equivalency

22   determination, unless the claimant presents evidence in an effort to establish equivalence."  *Burch*, 400

23   F.3d at 683; *see Lewis*, 236 F.3d at 514 (ALJ's failure to consider equivalence was not reversible error

24   because the claimant did not offer any theory, plausible or otherwise, as to how his impairments

25   combined to equal a listing impairment).

26        Here, the ALJ properly adopted Dr. Lopez' assessment and those of DDS physicians Dr. Dipsia,

27   Dr. Escobar and Dr. Mitts.  Plaintiff did not attempt to establish equivalence, and as such, the ALJ was

28   precluded to engage in assumptions about the effects of plaintiff's obesity on other impairments.

1   Plaintiff fails to demonstrate that her obesity and other impairments significantly limit her ability to

2   perform basic work.  The ALJ properly found that plaintiff's obesity did not prevent plaintiff to perform

3   work existing in significant numbers in the national economy.  Plaintiff establishes no error in the ALJ's

4   treatment of her obesity, especially given plaintiff's related treatment limited to recommendations to lose

5   weight.

6          Moreover, the ALJ did not err to determine plaintiff's residual functional capacity and vocational

7   ability.  To evaluate obesity "to determine a claimant's [residual functional capacity], the ALJ's

8   assessment 'must consider an individual's maximum remaining ability to do sustained work activities

9   in an ordinary work setting on a regular and continuing basis.'  As with other impairments, the ALJ

10  should explain how he determined whether obesity caused any physical or mental impairments." *Burch*,

11  400 F.3d at 683 (quoting SSR 02-01p).  In *Burch*, 400 F.3d at 683, the Ninth Circuit Court of Appeals

12  pointed to SSR 96-8p:

13          In assessing [residual functional capacity], the adjudicator must consider only limitations
            and restrictions imposed by all of an individual's impairments, even those that are not
14          "severe."  While a "not severe" impairment(s) standing alone may not significantly limit
            an individual's ability to do basic work activities, it may – when considered with
15          limitations or restrictions due to other impairments – be critical to the outcome of a
            claim.

16

17         As noted by the Commissioner, the plaintiff's residual functional capacity is consistent with the

18  ALJ's consideration of obesity as a limiting factor.  Based on his interpretation of the evidence, the ALJ

19  found that plaintiff is able to perform a wide range of light work.  (AR 20.)  Plaintiff points to no error

20  in the ALJ's evaluation of plaintiff's obesity in the ALJ's residual functional capacity assessment.  The

21  record is devoid of evidence of functional limitations from obesity of which the ALJ did not evaluate.

22                                   **Mr. Dachelet's Testimony**

23         Plaintiff argues that the ALJ failed to adopt Mr. Dachelet's testimony which addressed

24  limitations "supported" by plaintiff's testimony and "imposed" by Dr. Chopra.  The Commissioner

25  responds that the ALJ "properly discredited Dr. Chopra's extreme limitations" and appropriately

26  excluded from hypotheticals unproven limitations.

27         In the final step of the five-step disability evaluation, the Commissioner has the burden to show,

28  in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work

1   that exists in the national economy. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The

2   Commissioner "can meet this burden by propounding to a vocational expert a hypothetical that reflects

3   all the claimant's limitations." *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995). Alternatively, the

4   Commissioner can refer to the Medical-Vocational Guidelines. *Osenbrock*, 240 F.3d at 1162.

5       When vocational expert testimony is used, the vocational expert must identify a specific job or

6   jobs in the national economy with requirements that the claimant's physical and mental abilities and

7   vocational qualifications satisfy. *Osenbrock*, 240 F.3d at 1162-1163.

8       An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial

9   evidence in the record." *Osenbrock*, 240 F.3d at 1165. An ALJ may so limit a hypothetical even when

10  medical evidence conflicts. *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989). "An ALJ is free

11  to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence."

12  *Osenbrock*, 240 F.3d at 1165; *see Magallanes*, 881 F.2d at 756-757. Determination of "validity of

13  medical opinion offered" is "uniquely within the ambit of the ALJ, and the limitation of evidence

14  contained in the hypothetical at issue would be objectionable only if the assumed facts could not be

15  supported by the record." *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982). The parameters of

16  an ALJ's hypotheticals need not "include any alleged impairments that the ALJ has rejected as untrue."

17  *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997). An ALJ is not bound to accept restrictions in a

18  hypothetical question of claimant's counsel. *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).

19      The ALJ reasonably focused on light work with a sit/stand option. (AR 614-615.) Plaintiff's

20  alleged disabling asthma, diabetes, depression and hypertension were routinely controlled with

21  medication. *See Sample*, 694 F.2d at 643 ("there must be proof of the impairment's disabling severity.")

22  Plaintiff faces an absence of objective evidence to support plaintiff's back and knee pain. Plaintiff's

23  alleged lapse in concentration and attention is premised on plaintiff's self-serving comments. As noted

24  by the Commissioner, the ALJ properly discredited Dr. Chopra's far-reaching limitations. The ALJ

25  properly omitted alleged but unsubstantiated limitations from the hypotheticals. The ALJ properly relied

26  on Mr. Dachelet's testimony responding to the hypotheticals supported by evidence in the record.

27  Plaintiff fails to substantiate deficiency in the ALJ's evaluation of Mr. Dachelet's testimony.

28  / / /

### Plaintiff's Credibility

Plaintiff argues that her alleged limitations are credible in that she "has limiting daily activities," "takes many medications for her pain," and "needs to take breaks, lay down and elevate her legs." The Commissioner responds that the ALJ gave specific, legitimate reasons to discredit plaintiff in that plaintiff's impairments do not prevent her to accomplish her daily activities and the medical evidence fails to support her alleged limitations.

"Credibility determinations are the province of the ALJ." *Fair*, 885 F.2d at 604; *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988). "An ALJ cannot be required to believe every allegation of disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-serving statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

A claimant bears an initial burden to "produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security*, 359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen*, 80 F.3d at 1281)). If a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms with 'specific findings stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196 (quoting *Smolen*, 80 F.3d at 1284). "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing court may not engage in second-guessing. *Thomas*, 278 F.3d at 959. A reviewing court will not reverse an ALJ's credibility determinations "based on contradictory or ambiguous evidence." *Johnson*, 60 F.3d at 1434 (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). Moreover, "the ALJ is entitled to draw inferences 'logically flowing from

the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

> In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c). An ALJ's finding that a claimant generally lacked credibility is permissible basis to reject excess pain testimony.

*See also* SSR 96-7p.[4]

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

1.    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.    Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.    Type, dosage, effectiveness, and adverse side-effects of pain medication;

4.    Treatment, other than medication, for pain relief;

5.    Functional restrictions;

6.    Claimant's daily activities;

7.    Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.    Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

After reviewing the evidence, including plaintiff's testimony (AR 439-443), the ALJ properly

---

[4]    SSR 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

discounted plaintiff's claims:

> Weighing all relevant factors, the Administrative Law Judge finds that the claimant's impairments are not as limiting as she alleges. The claimant has testified to daily activities that are consistent with at least light exertion; she has not established that her impairments prevent her from accomplishing her daily routine. She is the primary caretaker of a young child, which implies a capacity for sustained effort. The claimant's testimony regarding her physical limitations is not supported by the consultative examination findings, or by objective evidence in the treating record. The evidence shows that claimant's diabetes, hypertension, and asthma are controlled by medications, and that she does not have musculoskeletal back injury which would limit her ability to walk, sit, or stand. The claimant's lack of work history does not give credibility to her statements that she is unable to work. (AR 443.)

As noted by the ALJ and Commissioner, the evidence fails to support plaintiff's alleged limitations. Although plaintiff complained of various ailments, her treatment at Tulare Community Health Clinic was routine and limited generally to medication without specialist referrals or aggressive treatment. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered treating physician's failure to prescribe and claimant's failure to request "any serious medical treatment for this supposedly excruciating pain"); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("conservative treatment" suggests "a lower level of both pain and functional limitation"); *Bunnell*, 947 F.2d at 346 ("unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" is relevant to assess credibility); *see also Flaten v. Secretary of Health & Human Servs.*, 44 F.3d 1453, 1464 (9th Cir. 1995) (ALJ entitled to draw inference from general lack of care). There is no evidence of plaintiff's worsening condition. (AR 248.)

In fact, the medical record casts doubts on the severity of plaintiff's alleged limitations. Dr. Pham's abdomen examination elicited no pain response with moderate to deep stethoscope palpation. (AR 189.) Dr. Pham's back examination revealed no palpable spasm. (AR 189.) Dr. Pham questioned plaintiff's complaints and noted her "subjective pain out of proportion to the exam level." (AR 191.) Dr. Pham noted "no obvious range of motion limitations." (AR 191.) Dr. Lopez' examination revealed no abdomen tenderness to palpation, normal spine and hip range of motion, and 5/5 motor strength in lower and upper extremity muscle groups. (AR 247-248.) Dr. House noted that although plaintiff claimed "chronic pain," "she exhibited no evidence of pain." (AR 236.) Plaintiff acknowledged that she had never been hospitalized for hypertension, asthma or diabetes mellitus and that she did not need an assistive device for her right knee pain. (AR 245.) The various medical imaging reports were

1    unremarkable.  (AR 156, 328, 371, 372, 485, 500, 505, 558, 568.)  Plaintiff acknowledged that she had

2    not received mental health care treatment.  (AR 85.)

3    　　　　The ALJ properly found that plaintiff's daily activities are consistent with light exertion.  "[I]f,

4    despite his claims of pain, a claimant is able to perform household chores and other activities that

5    involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ

6    to conclude that the claimant's pain does not prevent the claimant from working."  *Fair*, 885 F.2d at 603.

7    Plaintiff consistently noted that her activities include bathing, grooming, bed making, cooking, cleaning,

8    dishing washing, laundry, television watching, child care, preparing her son for school, walking, grocery

9    shopping, paying bills and newspaper reading.  (AR 100, 102, 129, 130, 133, 135, 237-238, 419-420,

10   603-605.)  Plaintiff acknowledged an absence of work history, and the ALJ properly noted as much to

11   question her credibility.  Plaintiff pointed to no specific medication side effects and noted she is on

12   probation for welfare fraud to cast further doubt on her credibility.  (AR 415.)

13   　　　　Specific, clear and convincing reasons support the ALJ's finding that plaintiff's allegations as

14   to her limitations are not credible.  (AR 20.)  *See Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999)

15   ("The ALJ pointed out several areas in which the appellant's testimony or behavior was inconsistent

16   with his own statements or actions, as well as with the medical evidence.")  Plaintiff overstated her

17   alleged limitations.  Based on the substantial evidence to support the ALJ's credibility determination,

18   this Court does not second guess the ALJ.

19   　　　　　　　　　　　　　　**CONCLUSION AND ORDER**

20   　　　　For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

21   properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by

22   substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

23   Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff SSI or to

24   remand for further proceedings. This Court DIRECTS the Court's clerk to enter judgment in favor of

25   defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff Veronica Gamez

26   and to close this action.

27   　　　　IT IS SO ORDERED.

28   **Dated:　　October 24, 2006　　　　　　　　/s/ Lawrence J. O'Neill　　　　　　**

1    66h44d                              UNITED STATES MAGISTRATE JUDGE